May it please the Court, I'm Rob Katerberg for BP. The $9 million award to Burkhalter Rigging in this case was the product of two fundamental misapplications of the Economic Loss Settlement Agreement. First, there were substantial indications that Burkhalter's primary business activity at the relevant time was as a specialty trade contractor for oil and gas companies, which is a business category that's expressly excluded from the settlement class. The appeal panel nevertheless found Burkhalter eligible to recover based on superficial representations by Burkhalter that the appeal panel let by without any scrutiny and refusing to look at who both Burkhalter's actual customers were. That was error and the program abdicated its critical role on this gateway screening issue of who's in and who's out of the class in the district court that abused its discretion by not taking this case up to address that issue. Don't we have case law rejecting the claim that the district court must review an NAICS categorization? We have case law that says it's not an abuse of discretion, don't we? Well, certainly the Louisiana tax credit case goes to this issue. That's a financial institution's exclusion issue. A different exclusion than oil and gas industry, but the same kind of process based on NAICS codes. And this court went ahead and looked at the issue and found that there was not, there the district court, they were excluded and it turned out that the claimant had the wrong code and also the appeal panel had the wrong code, but this court looked at what the proper code was and held that it was still excludable. And this oil and gas exclusion was a critical deal point for BP in entering into the settlement and if it just goes by with rubber stamping and there's no real effort to look into. Well, there's certainly evidence that they were not involved in the oil and gas business. I mean, the code supports that conclusion. Affidavit by the CEO that 90% of their business was non-oil and gas. I mean, it may not be as thorough as you want it, but there's certainly evidence in there to support the decision, isn't there? Well, Your Honor, the reliance on the code alone just goes against the settlement agreement because the settlement agreement says in Section 2.2.4 that the NAICS code is to be judged based on the substantive nature of the business. It's not simply a check the box exercise of what code has been listed on the tax return. To be sure, the NAICS code on the tax return is one step in the process, but the program has also elucidated in something known as Policy 480 that it's not conclusive. It's not even a presumption. So BP is arguing in this case that substantive is what's important? The substantive nature of the business is what determines whether the oil and gas exclusion applies. But what about Judge Davis's question that the evidence is that the substantive nature is not, it's overwhelmingly the other way? We think it's overwhelmingly in favor of it being an oil and gas business for several reasons. First, there's evidence from Burkhalter's website, and that's well documented in the record. The website, it's from pages 272 to 276 of the website. They say they provide complete solutions in engineered heavy lifting, rigging, and transport solutions for petrochemical and other industries. Sure, they do provide services to other industries, but it's telling that petrochemical is the They go on to say that they make complicated, supersized, heavy refinery projects run smooth and safe. That's page 272 of the record, and they tout their expertise in operating within the highly complex environment of a, quote, active refinery from 274. These are highly specialized services. You can't just be anybody off the street and go into a refinery and do these kinds of things, and they're touting that expertise on their website for a reason. Well, how do we know that's not 10% of their business? Well, so we have an expert affidavit in the record. This is 263 to 265 of the record, and our expert, who's somebody with 40-plus years of experience in the petroleum engineering industry, looked at this, and he said, and He goes on to say, and this is paragraph 11 of the affidavit, that code 237120, which is the oil and gas pipeline and related structures construction code, reflects the largest segment of their operations. Now, the CEO affidavit that Murano referred to, it's essentially two very conclusory sentences. It says approximately 90% of BRI's revenues in 2009 and 2010 were for clients unrelated to the oil industry. These clients were primarily in the industrial and manufacturing industries. There's no effort to confront the evidence that's actually in the record about who the customers were. Mind you, this affidavit came in at the very last step of the process in the appeal panel, so we didn't have an opportunity to scrutinize or respond to it, but he could have responded to the evidence that was in the record, the sales registers, which are at 1109 to 35 of the record, and that's what our figures are based on. We calculated, our industry experts calculated, and we know these companies because we're BP, we're in the industry, and we know who these folks are, and based on our calculation, it appears, I can't say it's conclusive because we don't have discovery in this process, but we have a well-informed reason to believe that 67% of the customers of iRevenue for 2011 were in the oil and gas industries or contractors that served the oil and gas industry. Let me turn back to- I don't understand why this is still not discretionary decision factually about one entity. Why, and if it is that, then it's not appropriate for us to find abuse of discretion. You have to find that there's some pressing issue or that it's not just a factual one-off. Can you please address that? Sure. So, if the appeal panel had actually looked at all of this evidence and had made a factual determination based on all of the evidence, then that would be a much different case. The posture, I would agree, would be much different. That is not what happened here. They actually excluded the evidence relating to the customers based on- But what difference does that make in other cases? The test is whether or not it's going to involve pressing questions of the settlement agreement of interpretation or implementation going forward in other cases. What evidence do you have- I mean, what argument do you have that this is more than just this case and you think that they handled it incorrectly? Well, it's- these cases about these threshold exclusions have come up a number of times. In fact, there's another case on the oil and gas exclusion that's going to be before a panel of this court the very next month in the May sitting. The oil and gas exclusion, the financial institutions exclusion, the real estate development all of these things come up all the time. And the issue is that if claimants can get into the class just based on sort of a box checking exercise, just kind of a summary assertion, and that will be subjected to no scrutiny whatsoever, that really destroys the fundamental balance that the parties had in mind when they entered into the settlement agreement. I mean, this is- you can almost think of this issue as sort of jurisdictional in a way because if they are not a class member, then they should be a stranger to this program. That doesn't mean that they can't file a claim. They were free to file a claim. But the settlement agreement, as has been well documented by the district court, by this court in a number of contexts, it provides very relaxed evidentiary standards and causation standards and there are very good reasons for BP to carve out certain types of industries, the oil and gas industry being one of them, from that regime. And if the gateway criteria can just be so easily satisfied just by a summary assertion, even when there are substantial facts that indicate otherwise- But the appeal panel conducted a de novo review of the record evidence, didn't it? Well, but then they go on to say- Does it say that? They say there is no- it says a de novo review of the record shows that while Klayman is certainly a specialty trade contractor, there is no support for BP's contention regarding the Klayman's activities. There's no support. It's only consistent with them not looking at the customer evidence, which, by the way, was exactly what Burkhalter urged them to do. Burkhalter cited appeal panel decisions where past appeal panels have said, you know, looking at customers creates absurd results. I think the example that was given was a catering business. You know, just if you have a catering business, the fact that they happen to cater to an oil and gas company providing food, that doesn't make them an oil and gas company, obviously. We have no disagreement with that, but that's sort of a reductio ad absurdum argument because here there is a specific category under the oil and gas industry exclusion that expressly covers contracting companies, construction companies that provide services to active refineries and in the building of other kinds of structures used in the oil and gas industry. I do want to get back to the CEO at Safa David because there are a couple points I wanted to make on it. So one of the assertions is approximately 90% of the revenues in 2009 and 2010 were for clients unrelated to the oil and gas industry. One problem right there is that reads out 2011 and 2012 are critical years because we know from section 2.2.4 of the settlement agreement that the focus for this inquiry as to the NAICS code is the class period, which as the court knows is April 20, 2010 to April 16, 2012. So this summary assertion is not even addressing the right time period. Then he goes on to say these clients were primarily in the industrial and manufacturing industries referring to the 90% that he claims were unrelated to oil and gas. That's another non sequitur because if you look at the codes that are listed under 2.3.7.120, many of them are manufacturing type industries because it's manufacturing that supports the oil and gas industry. So he's setting these two things up as mutually exclusive, but it just indicates that he's applying a different standard. He's thinking of oil and gas differently than the broad way that it's defined in the agreement. I'd like to just say a few words briefly about the facilities issue. Now, of course, if Borkhalter is determined to be ineligible to file a claim because it's in the exclusion, this becomes academic, but if not, then the facilities issue comes into play and it turns on interpretation of the settlement agreement as contract language and has the potential to significantly swing the valuation of the award. The settlement agreement provides in Section 5.3.3 that what are called multifacility businesses are subject to special rules that are described in Exhibit 5. And the concept that we intended to capture there is that the settlement is supposed to address localized harm to businesses in the Gulf Coast. So if you have a national business that has its home office in Louisiana, but it also has far-flung offices in, you know, Alaska or New York, and those operations happen to have a loss in 2010, I think everybody agrees that that's not something that the agreement is designed to compensate for. It was never intended to be sort of general national business loss insurance. Are you familiar with our facilities case, 847F3-167, 5th Circuit, 2017? I might know about it. It's 100250022, if that helps you. And in that case, we said, in reaching our decision that the district court did not abuse its discretion in denying discretionary review of the appeal panel decision in this instant case, we need not examine whether the administrator was actually correct in refusing to classify a certain reading room as a facility. And then there are other cases that talk about specifically this facility determination is a one-off factual thing, and we don't have to decide whether they were correct because it's not the type of decision that can be abuse of discretion for the district court. But the problem here is a process problem. The appeal panel simply abdicated its responsibility to ensure that fact-finding and factual inquiry was actually done on this because these were sales offices. One was near Nashville, Tennessee, and the other was in Houston, which is outside the Gulf Coast area. And it's very clear under the definitions that the settlement agreement applies and the policy, which is known as policy 467, that what counts for a facility is if you have employees or agents who perform their work at the location. These were both sales offices we're talking about, right? Yes, sir. How would a company compute the revenue that should be attributed to the salesman as opposed to the people who actually do the work? I mean, the salesman would probably take credit for all of it. But, I mean, I think they said they didn't have records of their revenues and expenses. I'm sure they had records of their expenses. But how would you allocate your overall revenue to the sales department? Well, Your Honor, Judge Davis, I think the way you would do it is that if, for example, the Nashville, Tennessee office made a sale, brought in a big job in the state of Kentucky, that would need to be excluded. The financials for that job would need to be excluded. The whole job? I mean, even though the salesman made a phone call and got the job? It's an interesting question. And there may be issues there to be explored that could be explored or remanded. That's exactly why the program hires lots of highly trained accountants to work through these kinds of situations. But that is the principle. If there were sales offices outside the zone, then somebody needs to figure out what portion of the claimant's business was attributable. That needs to get backed out of the settlement calculation. Well, one exclusion was if they can't show the revenues associated with the operations at that location. And they said they couldn't. And that came in in that very last-minute affidavit, I think, where the exact words were, we did not, we do not, we cannot. The did not and do not, that they did not and they do not break out the revenue by location, that's irrelevant under the settlement agreement because it's simply whether it's capable of being done. Now, the cannot gets a little closer to it, but we would submit it just doesn't withstand scrutiny. The whole reason you have sales offices is to generate sales. And ever since there was such a thing as salespeople and sales offices, you need to have a their performance. So the notion that you couldn't look back and see what sales, what projects the Nashville or the Houston office generates, it just doesn't, it doesn't withstand scrutiny and no questions were asked about this. And, you know, it remains to be seen how this will ultimately come out. But our point and the reason why we're here today is that the settlement program, the appeals panel, has a duty to look into these situations and to ensure that the faithful implementation of the settlement agreement. All right. Thank you, Mr. Ketterberg. You serve your rebuttal. Mr. Shelton. Hey, please, the court. My name is David Shelton. I'm here on behalf of the Appellee Claimant 100126024, known as Burkhalter Rigging. I want to start, if I may, briefly with the standard of review. Counsel opposite not particularly go into that. And since this appeal has been briefed, this court has handed down a number of opinions, a number of opinions, including some from these panelists, including some in the last week, but certainly several since we briefed this appeal that I would like to at least point out to this panel. Obviously, there have been a number of appeals brought in this court, some by aggrieved claimants who were unsuccessful below, others by BP, sometimes on large awards. This, obviously, is one of the latter. A couple of cases I would like to mention. Just last Thursday, the court handed down an opinion, it's in 18-30844, I believe it was authored by Judge Elrod, you were on the panel, Judge Elrod, where this court affirmed a $2 million award to a business. And I'm not going to read this to your honor. I do want to mention one thing, though. There is an abusive discretion standard here, but that needs to be unpacked just a little bit because this court has had a lot of things to say recently about that standard. This court has found that the district court below abuses this discretion if it declines to review a decision that actually contradicts or misapplies the settlement agreement. That part of the abusive standard discretion is the one cited by BP in this case. BP alleges a misapplication of the settlement agreement. But this court has also found, as recently as last Thursday, the district court does not abuse its discretion if it denies a request for review that involves no pressing issue, I'm sorry, no pressing question of how the settlement agreement should be interpreted and implemented, but simply raises the correctness of a discretionary administrative decision in the facts of a single claimant's case. I believe Judge Elrod was pointing in that direction earlier with her question. And then interestingly, in that case, the third point argued and discussed in the opinion acknowledged that even if the claims administrator made an error in omitting certain adjustments to the financials, that error bared only on the process of that claimant's claim and did not raise a recurring issue on which appeal panels are split or involve a pressing question of how the settlement agreement should be interpreted. 18-30778 was an opinion handed down just two weeks ago. Judge Elrod was also on the panel of that, affirming an award involving a hockey team. I won't repeat the standards because they are similarly discussed. And then one more opinion is from another panel is 18-30790, also fleshing out a bit the abuse of discretion standard applicable to these BP claims. Now, counsel opposite argued a few things I want to address just right off the bat. Let me just ask you. Yes, sir. Claims administrator ask you for any documents that you didn't send them? No, Your Honor. Did they ask you for a customer list or a list of any customers in the oil and gas business? Let me explain the way that came down. You can answer my question first. They did not specifically ask for a list of customers. Claims administrator did not ask that specific question. They did ask, what's the nature of your business? What do you do? I see some revenue items that say these certain things. What do those accounts mean? I see some expense items that are these particular expenses. What do those mean? Both of which bear upon the nature of the clients of the Burke Halters business. And, Judge David, further to your question, Judge Davis, yesterday you asked a panelist about what code appeared in the return. The settlement agreement points to documents such as the 2010 tax return or documents, like in this case, in Mississippi, businesses are required to file annual reports with the Secretary of State, and those documents have a place to indicate your business code. And wisely, the settlement agreement negotiated by BP and class counsel looked to what businesses said they were before they knew about the spill, before the spill even happened, before the settlement agreement even happened. So when you're talking about, as counsel said, who is in and who is out, who did you say you were before you knew what these rules were? And in this case, Burke Halter Rigging used the code adopted by the claims administrator. No request was ever made to your company to furnish any information of what business you did for oil and gas companies? No, it was a question that, what do you do? There was never a specific, do you do business for oil and gas, or do you do business for other industry? Not that specific question, Your Honor. Another thing I want to mention about this code, the substantive nature of the business, BP is focusing on the substance, and the claims administrators were referred to as the DHECC, or the CSSP, Court Supervised Settlement Program. They did hire highly skilled workers, both accountants and program vendors, to review these sorts of matters. They did make inquiry into the nature of claimant's business. I think counsel said that they did not. They asked questions that said, we've looked at your website, explain this and this and this, questions about the website. But if you encourage, Your Honor, to look at the opinion from the appeal panel. If you read nothing else, look at 245 and 246 in the record. It's a two-page opinion from the appeal panel. In the appeal panel's decision below, which the district judge did not review, he exercised his discretion not to review it, the appeal panel walked through these two arguments that are presented today by BP. Number one, the oil and gas exclusion. And number two, the facility issue. The appeal panel set out BP's arguments and BP's claims. And then the appeal panel set out the claimant's contention and laid out both arguments from both sides. Then concluded, based upon a de novo review,  that claimant activities are primarily related to oil and gas pipeline and related structures construction and that the code was appropriate. That's based on a de novo review. I think the emphasis there should be placed upon primarily related to the oil and gas industry. Burkhalter does not claim that it did zero work for any customer with some relation to the oil and gas industry. It was just tiny. Which brings me to this point. I want the record is voluminous. I want your honors to understand how we came about to this point. And this goes back to your earlier question, Judge Davis. In connection with processing these claims, the administrator routinely asked claimants for documents supporting financial information, revenue information. And so the question that was asked that led to these customers is provide me with support for your revenues from the months of May to November 2009 through 2011. In response to that request, Burkhalter provided its sales registers. It provided that to support its revenue. The documents supported its revenue. The claims administrator eventually issued an eligibility notice based upon a benchmarking compensation period of May to November. So on that list, though, it did list identities of customers. So what was in the record is customers from Burkhalter Rigging for a seven-month time period over three years. So it's not every customer they had during the time period. So what BP did is they said they know, let's see, I wrote it down. We know these companies is what counsel officer said. We know these companies and they're in the oil and gas business. What they don't know is what kind of work was being done for these companies. But nevertheless, BP appeals and argues that Burkhalter's business during that time period, a plurality during one year was related to oil and gas business, and 67% in another year was related to oil and gas business. I've never seen that math. There's nothing in the record to support it other than an unsworn conclusory statement. The expert they refer to doesn't mention that, doesn't do the calculations. I'd invite you to ask counsel officer where in the record that is, but it doesn't exist. But we engaged in a bit of a briefing war at the appeal stage with supplemental briefs being filed. Once BP was pressed on that, they listed some companies that were oil and gas companies, and they engaged in some irresponsible Googling because some of their customers were actually, it was just a totally different name. It wasn't even, BST was an example. They said, oh, that's a so-and-so company, a big oil and gas company. It was a totally different company. So we've never gotten there. And so the point of the CEO's affidavit, we couldn't let the record talk about a plurality of, it's just false information. It's just not true. We could not let that go unaddressed. So for the critical months, tell me what you furnished that would show the kind of business you were doing. Well, there were a number of questions, Your Honor, from the, so we filled out a claim form and described the business. And then the program vendors asked us questions, and it's in my brief, the record. I may be able to pull it while I'm answering, but ask us about the business, and Burkhalter provided responses to the claims. And they're part of their ordinary inquiry to figure out what type of business they're dealing with here and to assign an NAICS code to the business. Just the closing point on that, from my perspective, the closing point is BP is trying to brand this company, Burkhalter, with a code that's never used before, ever. There's no, it's not anywhere. It's never been used. They have taken some sales information that includes some customers, done some sort of math, and tried to contort the business into something that it's not. But most importantly, the appeal panel considered that. And so the idea that BP, in their opening brief, repeatedly, I thought this was interesting. Now I kind of see it a little bit more why they were doing it. BP's opening brief, they said this. The appeal panel here adopted a rule that requires the settlement program to ignore a specialty contractor's customer list when analyzing whether the contractor falls under the oil and gas exclusion. That is not true. That is not in the appeal panel decision. When pressed with that in our opposition brief, on reply, BP came back with a slightly softer approach, but still, they declared that the panel refused to even consider the customer list. That's what BP said in the reply brief. If you look at the appeal panel decision, which is two pages long, but does describe each party's position and conducts a de novo review and conclusion, neither of those things did the appeal panel do. And in fact, the panel did consider these things, but rejected them. That is the type of approach that the Fifth Circuit has refused to reverse. It's a discretionary decision in a one-off factual case where it's not like the settlement program did not ask these questions of the claimant. They did ask these questions. The claimant responded. On appeal, the appeal panel addressed the issues and conducted a de novo review and ruled in our favor. So, counsel opposites mentioned earlier, the panel, this is his quote, he said the panel excluded evidence of customers. That's not what the panel did. That's factually just not true. And he also said that there's just no scrutiny whatsoever. The record does not support that. And in our brief, we cited to numerous record citations where the claim center asked questions of us, of Burke Alter, and Burke Alter responded with the information. With respect to the facilities issue, briefly, that was a question that was repeatedly asked. And the information on that issue spans the arc of the claim. Okay, the very first day the claim was filed in 2012, sometimes I feel like surely I have to be the last claim coming through here, but in 2012, on the claim form itself, Burke Alter disclosed the existence of one or two man sales offices in different locations and said we don't think that meets the definition of a multi-facility claimant. That's in what's called the purple form. It's the claim form. So on the very first day, Burke Alter Rigging informed the settlement program of that fact. In 2016, there were a round of questions about the website and the locations of the business. In 2017, there were another round of questions about the facility issue, and Burke Alter answered all of those. For the record, 1046 in our electronic record on appeal is where Burke Alter disclosed that from the very beginning. Also, Your Honor, there are places I want to point to in the record. 1109 is where the claim center asked for the documentation to verify revenues for the three years. 1110 is where the Burke Alter responded. 1354 is another series of questions and answers and information provided. And then, Judge Davis, to your question, 1352 is where the claimant responded back in 2015 where the claim center asked what are your business operations, what are your projects? Those are the questions that bear on what type of business, and that was the investigation. It was not a cursory review by any means. The claim was filed in November 2012, and the award came out in the fall of 2017. What was the scope of the inquiry that was made? I'm sorry, Your Honor. What was the scope of the inquiry beyond your client's statement about the facilities? Exactly what did the panel look at? Yes, sir. You can just give me a one, two, three, four. What did they do? Okay. So on the claim form itself, the claimant submitted information about the facilities. In 2016, the claim center asked questions about the facilities. I have record sites on this. In 2017, they asked the question again about the facilities, new questions. They're asking the questions of your client, right? Yes, yes, Your Honor. Or answers. So my question is beyond asking your client and getting answers, beyond just accepting the answers. Yeah. Well, we know from the record that the claim center reviewed the website. I don't, you know, their conclusion, this is in 1510 in the record. I'm sorry, 1509 and 1510. The claim center concluded about multiple office locations and multiple project locations. And here's what they said. The accountants noted from the claimant's website that the claimant listed multiple office locations. Council confirmed. And it cites what the, you know, what we submitted. And then it says multiple project locations. Notes from the claimant's website. So we know that they reviewed website and we know they ask us very pointed and detailed questions that follow the language of the settlement agreement and the applicable policies, policy 467. Um, in the record, for example, Your Honor, 1501, they ask about the Houston, Texas office. We see on your website, which, you know, here they're reviewing it in 2017, looking at a website. So, you know, sometimes there are some, well, in 2017, here is, here are the facts. In 2010, during the settlement, here are some facts. So we responded that way. But at 1501, you'll see questions from the claim center. At 1505, you see responses to those questions, including the nature of their projects and the nature of their business and the sales offices. So, you know, it's not a situation where the claim center just concluded that, oh, well, these aren't, these, the claimant says they're sales offices, so they must be sales offices. That's not what happened. We did claim that, and we said, ask us questions, which they did over a period of years, which Burkhalter responded to, and the settlement program concluded that there were no other facilities. And on appeal, the appeal panel ruled similarly. So just in closing, I'm out of time, but this is exactly the type of case that has little  There are no recurring issues. BP can't get there. They don't even, in the brief, they don't argue that the issue is recurring. They don't mention it. And a lot of the cases that have come down since the briefing's been complete, BP's briefing itself just is, it's not satisfactory to meet the standard, and they haven't tried to brief it, you know, since the briefing was complete to address any of the court's decisions, which pretty clearly result in their appeal falling short. So I'll just ask that the district court's decision be affirmed. All right. Thank you, sir. Thank you, Your Honor. Back to you, Mr. Ketterberg. May it please the court, just a few quick points. I have two quick questions. First one is, I want to make sure you've had an opportunity, and I think you have, to please articulate what is the new rule or policy that is articulated in this case that justifies it to be not an abuse of discretion. That scrutiny has to be conducted to fulfill the gatekeeping function. Right, but that's not And to establish a rule that customer evidence, evidence about who a claimant's customers are is properly considered. That was my second question. I don't see in the appeals panel decision that the appeals panel formulated a rule that customers are irrelevant to determining the proper classification, as it says on pages 15 and 16. That's not anywhere in the appeals panel decision. Judge Elrod, we think that's by far the most reasonable reading. I mean, often these appeal panel decisions aren't models of clarity, and this one is no exception. But if you look at what was being urged to the appeal panel, what Burkhalter urged in its briefing was that this notion that you look at customers in determining the appropriate NAIC code, NAICS code, that that's simply not done. And they cited a number of appeal decisions that say that. They're in the record, the ones they cited at 328 to 356. So one of them, appeal panel 2017-164. Where in this appeal panel decision does it say, we establish a new rule that customers cannot be considered, like your brief says? It wasn't a new rule. It was a rule that previously... Where does it say they're establishing that as a rule? It doesn't say it expressly, but we think that's the only reasonable way to read it, because other appeal panels had done that, and that was the rule that was being urged to this appeal panel. And then they said there is no support. If they had looked at the customers, they wouldn't have said there's no support. They might have said, we find some support, but we find it's outweighed by this other stuff. Your Honor, I want to briefly address the standard of review. I'm going to get this from Texas Gulf Seafood, that I believe it's been articulated elsewhere. As we read this Court's decisions, there's two separate prongs. One is if the settlement agreement is contradicted or misapplied, or if the ruling of the appeal panel has the clear potential to contradict or misapply the settlement agreement. We think we'd meet that standard. There's a separate alternative prong, which is if there's a recurring issue on which appeal panels are split. We hadn't briefed that, but since the Claimants Council believes that we have to meet that in order to get review, I want to say they have made that case for us as well, because their citation of this long string of appeal decisions shows that this is a recurring issue. And what's more, it also shows that appeal panels are split, because some of the appeal panel decisions that are cited did consider customers, and I think those are actually useful. If you didn't brief this, then you can't argue this, can you? I mean, you have abundant knowledge of these cases, and this has been the standard for years. For 2017, this was the standard. This is not some new thing from yesterday. Right, and we think there is a contradiction or a misapplication, but since— But you didn't brief that. We didn't brief it, but I'm hearing today that he thinks that there needs to be a split, and it needs to be recurring, and what I'm just saying, the evidence of the record clearly demonstrates that as well. I want to talk briefly about the tax returns, because as I understand Claimant's argument, it relies principally on the fact that Burkhalter had used this particular NAICS code, the non-oil and gas one, in tax returns. A policy called Policy 480 was promulgated, and it made a very clear reversal of what the previous regime had been. The previous regime had been that 2010 tax records were prioritized. Policy 480 changed that, and it says, the NAICS code used on the 2010 tax return or business license will not be considered conclusive, and the claims administrator will not apply any presumptions regarding the selection of the NAICS code to classify the entity properly. Instead, it's to be determined based on all evidence available regarding the actual business activities of the claimant. Council also referred to the test for oil and gas, the oil and gas exclusion as turning on the word primarily, and I wholeheartedly agree with that. In fact, I looked at Exhibit 17, and the word primarily, I lost count after seeing that it was used 10 times, and I think what that means is it doesn't have to be exclusively oil and gas, and we don't contend that they don't provide any services to other industries, but Council has now acknowledged that they do work for the oil and gas industry, and in our opening brief on page 13, footnote 4, we listed the 60 customers that the industry experts identified as players in this industry that BerkCulture provides services to. Their brief was silent on that, and even this morning, I heard him talk about one of the 60, BST. He says, we got the name wrong. That's a shame on us for getting BST wrong, but that leaves another 59 that simply have not been addressed. The appeal panel and the program have a critical role in fulfilling their gatekeeping function to ensure that only eligible claimants are able to recover under the settlement agreement. We appreciate the Court's attention and ask the Court to reverse. All right. Thank you to both Council for your briefing and argument. The case will be submitted. The panel will stand and recess.